In the Matter of the ESTATE of Arminta HICKS, Deceased.

Lue Del CAUDLE, Carrie Murphy, and Norvell Boylan, Plaintiff in Error,

v.

Pearl NORRIS, Defendant in Error.

No. 35803.

Supreme Court of Oklahoma.

June 1, 1954.

Rehearing Denied Nov. 16, 1954.

G. C. Spillers and G. C. Spillers, Jr., Tulsa, for plaintiffs in error.

Van Cleave & Thomas, Harley Van Cleave, Raymond B. Thomas, Charles C. Liebler, Tulsa, for defendant in error.

ARNOLD, Justice.

The will of Arminta Hicks, deceased, was offered for probate in the County Court of Tulsa County by Pearl Norris, daughter of deceased and the executrix named in the will.

The will in question made a bequest of $250 each to five of her children, minor bequests to three grandchildren, bequests of specific personal property to several of the children, and all the rest and residue of deceased's property, both real and personal, to her daughter, Pearl Norris, for life, the remainder to go in fee simple at her death to her grandson Frankie Norris, the son of Pearl Norris, a diabetic and mentally retarded child.

Three of the children, Lue Del Caudle, Carrie Murphy, and Norvell R. Boylan, filed their objections to the probate of the will on the grounds that deceased lacked testamentary capacity and that the will was procured by undue influence on the part of Pearl Norris. Upon hearing the County Court entered its order admitting the will to probate. Appeal from this order was taken in due time to the District Court on "all questions of law and fact".

Upon trial de novo in District Court both contestants and proponents introduced voluminous testimony going to the questions of testamentary capacity and undue influence. Briefly, this evidence is designed to show that the testatrix at the time of her death in December, 1951, was 78 years old; that for more than ten years prior to her death she had been in ill health; that in 1938 or 1939 she broke her shoulder in a fall; that in 1942 she sustained a severe head injury in an automobile accident from the effects of which she was practically bedfast for about a year and a half; that she had suffered from a heart condition, Bright's disease, diabetes, arthritis and dropsy for a number of years; that her health progressively declined so that in the latter years of her life she needed assistance in going from room to room in her home; that her eyesight started failing in about 1949 and grew progressively worse; that on occasions she had delusions and lapses of memory; that she owned the apartment house in which she lived; that she continued to collect the rents therefrom although she usually had one of her children write the receipts for the tenants; that she handled the insuring of the apartment house herself; that her daughter Pearl lived two doors south of her mother and her son, Norvell, lived next door to deceased; that Pearl was very devoted to her mother, looked after her business affairs for her, deposited the rent money in an account carried jointly in the names of Pearl and testatrix; that the other daughters were also devoted to their mother and helped care for her physical needs; that testatrix was very fond of all her children, tried to treat them all alike, and assisted most of them financially from time to time, but seemed to repose the most confidence in Pearl; that in about June, 1950, Pearl told one of her sisters (a contestant herein) that she was going to see that her mother made a will and made it right; that on about July 3, 1950, Pearl, in company with another sister, drove testatrix to her lawyer's office; that this lawyer had handled several matters for testatrix prior to this time, had represented her son, Norvell, in some matters and had also advised Pearl on some matters; that testatrix went to the lawyer's office alone and gave him instructions for

drawing her will; that the lawyer drew the will in accordance with these instructions and brought it to testatrix' house on July 5, 1950; that when he arrived testatrix was on the front porch of her home with one of her tenants also present; that the lawyer took testatrix inside the house and carefully read the will to her, paragraph by paragraph, and that she assented to each paragraph; the lawyer and testatrix then returned to the front porch, the lawyer called his wife, who was waiting in the car for him, and testatrix asked the lawyer's wife and the tenant to witness her will; that testatrix then signed the will in the presence of the two witnesses and they signed in her presence and in the presence of each other; that thereafter on several occasions she told various people, including her brother and a nurse at the rest home to which she was eventually taken, how she had disposed of her property in her will and the reasons why she had made Pearl the principal beneficiary thereof.

Two doctors, one a general practitioner who had treated her over a period of years and the other a neurologist who had treated her after her head injury in 1943 and for a neuritic condition of her eyes caused by diabetes in August, 1950, both testified that in their opinion deceased was capable of knowing the extent of her bounty and of disposing her property by will on July 5, 1950; that while she was advanced in years and in feeble health she was definitely competent and knew what she wanted to do and was quite firm about it; that while in April, 1951, she started having delusions that was not uncommon considering the state of her health at that time.

The District Court entered judgment affirming the order of the County Court admitting the will to probate. From order overruling motion for new trial contestants appeal.

Contestants contend that the finding of the trial court that there was no undue influence exercised by Pearl Norris in procuring the will is contrary to the great weight of the evidence and is unsupported thereby. In this connection they also contend that because of her ill health deceased lacked testamentary capacity.

In support of this contention the contestants point to various details of the evidence to the effect that when Pearl did not get what she wanted from her mother she would have a "tantrum"; that on such occasions her mother would usually give in to Pearl's wishes; that because of her feeble health testatrix did not know at times what she was doing; that Pearl said she was going to see that her mother made a will and made it "right".

On the other hand there is testimony by numerous witnesses that though testatrix was infirm and feeble she was in full control of her affairs and mentally competent in 1950, the year in which she made her will, and at least up until April, 1951, when she became so ill it was difficult to give her proper care at her home and on the advice of a doctor she was placed in a rest home; that Pearl was a very devoted daughter to her; that Pearl was more of a business woman than her other daughters; that Pearl at her mother's request handled her banking for her and paid her bills; that testatrix consulted with a lawyer several times before giving instructions to prepare her will; that she went alone into the lawyer's office to have the will prepared; that the will was read to her previous to her signing it by her lawyer; that the will was signed in the presence of two disinterested witnesses; that Pearl was nowhere about when the will was executed. There is also testimony that Pearl had diabetes and that her son, Frankie, was a physically impaired child who would need medical care all of his life; that several times after making the will testatrix told various people that she had so disposed of her property because Pearl had taken care of and nursed testatrix while pregnant, that the child had been born physically impaired and would need medical care the rest of his life, and that testatrix wanted to be sure the child was taken care of.

The judgment of the trial court that at the time of the execution of the will deceased was competent and was not

acting under duress, menace, fraud, or undue influence is not clearly against the weight of the evidence.

Affirmed.

HALLEY, C. J., and CORN, O'NEAL, WILLIAMS and BLACKBIRD, JJ., concur.